AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

In the Matter of the Search of
1350 E Northern Avenue, Phoenix, Arizona 85020, Unit 333

Case No.  MB 24-3403

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

**As further described in Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**As set forth in Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before ___**10/31/24**___ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>any United States Magistrate Judge on criminal duty in the District of Arizona</u>.

☒I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    __10/18/24__

*Michael T. Morrissey*
*Judge's signature*

City and state: <u>Phoenix, Arizona</u>

<u>Honorable Michael T. Morrissey, United States Magistrate Judge</u>
*Printed name and title*

## **ATTACHMENT A**

*Property to be Searched*

      The property to be searched is Unit 333 of the Halifax Apartments, located at 1350 East Northern Avenue, Phoenix, Arizona 85020. Apartment Unit 333 is contained within a multi–unit, multi-family, three-story building. Unit 333 is on the third floor facing east, at the top of the northern set of stairs, on the east side of the building. The building runs north to south and is the southeastern most building in the complex. The complex is north of Northern Avenue, between 13th Street and 14th Street, in the city of Phoenix, Arizona.

# ATTACHMENT B

*Property to be seized*

As used below, the terms "records" and "information" includes all forms of creation or storage, including any form of electronic storage (cellular telephones); any handmade form (such as writing); and mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, or videotapes), and the records and information to be seized shall be limited to June 1, 2024 to the date of this warrant.

1.  Any illegal controlled substances;

2.  Books, records, receipts, notes, ledgers, invoices, and any other documentation related to the manufacture, importation, transportation, ordering, purchase, sale, or distribution of controlled substances;

3.  Drug ledgers, drug customer lists, drug inventory lists, weights and prices, dealer lists, criminal associates lists, or any notes containing the individual names of such persons, telephone numbers or addresses of these customers or dealers, and any records of accounts receivable, money paid or received, drugs supplied or received, cash received, or to be paid for controlled substances, or intended to be paid for controlled substances;

4.  Any records and information which constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) including, without limitation, books, records, receipts, notes, ledgers, invoices, and any other documentation related to the laundering of drug proceeds from the manufacture, importation, transportation, ordering, purchase, sale, or distribution of controlled substances from;

5.  Records relating to the receipt, transportation, deposit, transfer, or distribution of money, including but not limited to, direct deposit confirmations, wire transfers, money orders, cashier's checks, check stubs, PayPal or other electronic money transfer services, check or money order purchase receipts, account statements, and any other records reflecting the receipt, deposit, or transfer of money;

6.     United States currency, foreign currency, financial instruments, negotiable instruments, jewelry, precious metals, stocks, bonds, and receipts or documents regarding purchases of real or personal property;

7.     Safe deposit box keys, storage locker keys, safes, and related secure storage devices, and documents relating to the rental or ownership of such units;

8.     Currency counters;

9.     Indicia of occupancy, residency, rental, ownership, or use of the **SUBJECT PREMISE 1** (as described in Attachment A-1) and any vehicles found thereon during the execution of the warrant, including, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

10.     Photographs, including still photos, negatives, slides, videotapes, and films, in particular those showing co-conspirators, criminal associates, U.S. currency, real and personal property, firearms, or controlled substances;

11.     Paraphernalia related to the importation, transportation, use, or distribution of controlled substances or proceeds from the sale of controlled substances, including materials commonly used for the clandestine shipment thereof, including but not limited to, scales, bottles, mixing bowls, spoons, grinders, cutting agents, cutting boards, baggies, knives/razors, plastic wrap/cellophane, tape, seals, boxes, packaging materials, scent masking agents, shipping labels, and storage containers;

12.     Any firearms including handguns, pistols, revolvers, rifles, shotguns, machineguns, machinegun conversion switches, any other weapons, firearm parts, frames, receivers, lightning links, swift links, auto sears, accessories, magazines, cases, boxes, holsters. Any ammunition and components including bullets, brass, casings, boxes, and cases. Any evidence of possession of firearms, to include gun boxes and transfer paperwork.

13.     Cellular telephones (hereafter referred to collectively as "electronic storage media");

14.    Records evidencing ownership or use of electronic storage media, including sales receipts, registration records, and records of payment from;

15.    Any records and information found within the digital contents of any electronic storage media seized from the **SUBJECT PREMISE 1** (as described in Attachment A-2), from June 1, 2024 to the present including:

    a.  all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of drugs, drug packaging, and weapons;

    b.  all information related to buyers or sources of drugs or weapons (including names, addresses, telephone numbers, locations, or any other identifying information);

    c.  all bank records, checks, credit card bills, account information, or other financial records;

    d.  all information regarding the receipt, transfer, possession, transportation, or use of drug or firearm proceeds;

    e.  any information recording schedule or travel;

    f.  evidence of who used, owned, or controlled the electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, correspondence, and phonebooks;

    g.  evidence indicating how and when the electronic storage media were accessed or used to determine the chronological context of electronic storage media access, use, and events relating to crime under investigation and to the electronic storage media user;

    h.  evidence indicating the electronic storage media user's state of mind as it relates to the crime under investigation;

   i.  evidence of the attachment to an electronic storage medium of another storage device or similar container for electronic evidence;

   j.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage media;

   k.  evidence of the times the electronic storage media were used;

   l.  passwords, encryption keys, and other access devices that may be necessary to access the electronic storage media;

   m. documentation and manuals that may be necessary to access the electronic storage media or to conduct a forensic examination of the electronic storage media;

   n.  records of or information about Internet Protocol addresses used by the electronic storage media;

   o.  records of or information about the electronic storage media's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

   p.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, videotapes, motion pictures, or photocopies). This shall include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications;

reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the computer, electronic device, or other storage medium.

This warrant authorizes a review of records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the USPIS may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>1350 E Northern Avenue, Phoenix, Arizona 85020, Unit 333 | Case No.  MB 24-3403 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance |
| 21 U.S.C. § 841 | Possession with Intent to Distribute a Controlled Substance |
| 18 U.S.C. § 933 | Trafficking in Firearms |
| 21 U.S.C. § 922(O)(1),<br>924(a)(2) | Possession or Transfer of a Glock Switch |

The application is based on these facts:

**See attached Affidavit of Special Agent Lucas Hoss**

☒ Continued on the attached sheet.

☒ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Ryan McCarthy

*Ryan McCarthy*
Digitally signed by Ryan McCarthy
Date: 2024.10.18
16:39:44 -07'00'

Sworn to me telephonically and subscribed electronically.

Date: ____10/18/24____

City and state: Phoenix, Arizona

LUCAS HOSS  Digitally signed by LUCAS HOSS Date: 2024.10.18 16:20:48 -07'00'
_____
*Applicant's Signature*

Lucas A. Hoss, Special Agent, DEA
_____
*Printed name and title*

*Michael T. Morrissey*
_____
*Judge's signature*

Honorable Michael T. Morrissey, United States Magistrate Judge
_____
*Printed name and title*

## <u>ATTACHMENT A</u>

*Property to be Searched*

     The property to be searched is Unit 333 of the Halifax Apartments, located at 1350 East Northern Avenue, Phoenix, Arizona 85020. Apartment Unit 333 is contained within a multi–unit, multi-family, three-story building. Unit 333 is on the third floor facing east, at the top of the northern set of stairs, on the east side of the building. The building runs north to south and is the southeastern most building in the complex. The complex is north of Northern Avenue, between 13th Street and 14th Street, in the city of Phoenix, Arizona.

**ATTACHMENT B**

*Property to be seized*

As used below, the terms "records" and "information" includes all forms of creation or storage, including any form of electronic storage (cellular telephones); any handmade form (such as writing); and mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, or videotapes), and the records and information to be seized shall be limited to June 1, 2024 to the date of this warrant.

1.      Any illegal controlled substances;

2.      Books, records, receipts, notes, ledgers, invoices, and any other documentation related to the manufacture, importation, transportation, ordering, purchase, sale, or distribution of controlled substances;

3.      Drug ledgers, drug customer lists, drug inventory lists, weights and prices, dealer lists, criminal associates lists, or any notes containing the individual names of such persons, telephone numbers or addresses of these customers or dealers, and any records of accounts receivable, money paid or received, drugs supplied or received, cash received, or to be paid for controlled substances, or intended to be paid for controlled substances;

4.      Any records and information which constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering) including, without limitation, books, records, receipts, notes, ledgers, invoices, and any other documentation related to the laundering of drug proceeds from the manufacture, importation, transportation, ordering, purchase, sale, or distribution of controlled substances from;

5.      Records relating to the receipt, transportation, deposit, transfer, or distribution of money, including but not limited to, direct deposit confirmations, wire transfers, money orders, cashier's checks, check stubs, PayPal or other electronic money transfer services, check or money order purchase receipts, account statements, and any other records reflecting the receipt, deposit, or transfer of money;

6.      United States currency, foreign currency, financial instruments, negotiable instruments, jewelry, precious metals, stocks, bonds, and receipts or documents regarding purchases of real or personal property;

7.      Safe deposit box keys, storage locker keys, safes, and related secure storage devices, and documents relating to the rental or ownership of such units;

8.      Currency counters;

9.      Indicia of occupancy, residency, rental, ownership, or use of the **SUBJECT PREMISE 1** (as described in Attachment A-1) and any vehicles found thereon during the execution of the warrant, including, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

10.     Photographs, including still photos, negatives, slides, videotapes, and films, in particular those showing co-conspirators, criminal associates, U.S. currency, real and personal property, firearms, or controlled substances;

11.     Paraphernalia related to the importation, transportation, use, or distribution of controlled substances or proceeds from the sale of controlled substances, including materials commonly used for the clandestine shipment thereof, including but not limited to, scales, bottles, mixing bowls, spoons, grinders, cutting agents, cutting boards, baggies, knives/razors, plastic wrap/cellophane, tape, seals, boxes, packaging materials, scent masking agents, shipping labels, and storage containers;

12.     Any firearms including handguns, pistols, revolvers, rifles, shotguns, machineguns, machinegun conversion switches, any other weapons, firearm parts, frames, receivers, lightning links, swift links, auto sears, accessories, magazines, cases, boxes, holsters. Any ammunition and components including bullets, brass, casings, boxes, and cases. Any evidence of possession of firearms, to include gun boxes and transfer paperwork.

13.     Cellular telephones (hereafter referred to collectively as "electronic storage media");

14.    Records evidencing ownership or use of electronic storage media, including sales receipts, registration records, and records of payment from;

15.    Any records and information found within the digital contents of any electronic storage media seized from the **SUBJECT PREMISE 1** (as described in Attachment A-2), from June 1, 2024 to the present including:

    a. all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of drugs, drug packaging, and weapons;

    b. all information related to buyers or sources of drugs or weapons (including names, addresses, telephone numbers, locations, or any other identifying information);

    c. all bank records, checks, credit card bills, account information, or other financial records;

    d. all information regarding the receipt, transfer, possession, transportation, or use of drug or firearm proceeds;

    e. any information recording schedule or travel;

    f. evidence of who used, owned, or controlled the electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, correspondence, and phonebooks;

    g. evidence indicating how and when the electronic storage media were accessed or used to determine the chronological context of electronic storage media access, use, and events relating to crime under investigation and to the electronic storage media user;

    h. evidence indicating the electronic storage media user's state of mind as it relates to the crime under investigation;

i.   evidence of the attachment to an electronic storage medium of another storage device or similar container for electronic evidence;

j.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage media;

k.   evidence of the times the electronic storage media were used;

l.   passwords, encryption keys, and other access devices that may be necessary to access the electronic storage media;

m.   documentation and manuals that may be necessary to access the electronic storage media or to conduct a forensic examination of the electronic storage media;

n.   records of or information about Internet Protocol addresses used by the electronic storage media;

o.   records of or information about the electronic storage media's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

p.   contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, videotapes, motion pictures, or photocopies). This shall include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications;

reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the computer, electronic device, or other storage medium.

This warrant authorizes a review of records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the USPIS may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Lucas A. Hoss, being first duly sworn, hereby deposes and states as follows:

### I.     INTRODUCTION AND AGENT BACKGROUND

1.     Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 1350 E Northern Avenue, Phoenix, Arizona 85020, Apartment 333 (hereinafter, the "**Subject Premises 1**"), as further described in Attachment A, in order to search for and seize the items outlined in Attachment B, which represent evidence, fruits, and/or instrumentalities of the criminal violations further described below.

2.     I am a Special Agent with the Drug Enforcement Administration (DEA), and have been since May 2021.  Your Affiant is currently assigned to the Phoenix Field Division, Group 16 ("DEALERS"). DEALERS is an enforcement group comprised of agents and officers from federal and local agencies, assigned to investigate large-scale drug trafficking. Your Affiant has successfully completed the DEA Basic Agent Training in Quantico, Virginia, where he received several hundred hours of comprehensive, formalized instruction in such matters as drugs identification, detection, trafficking and interdiction, money laundering techniques, and asset identification, seizure and forfeiture. Throughout his time in law enforcement, your Affiant has conducted and participated in multiple investigations involving the unlawful importation, transportation, and distribution of drugs to include cocaine, heroin, methamphetamine, and marijuana, as well as investigations involving money laundering. Your Affiant has debriefed defendants and witnesses who had personal knowledge regarding major drug trafficking organizations. Your Affiant has also participated in conducting physical and electronic surveillance, using confidential sources and sources of information, executing search warrants, and making arrests. Your Affiant is familiar with methods employed by large drug organizations and the tactics they

use to evade law enforcement, such as the frequent changing of cell phones, the use of prepaid phones ("burner phones"), counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, the use of false or fictitious identities, and coded communications and conversations.

3.      By virtue of your Affiant's employment as a Special Agent, your Affiant has performed various tasks, which include, but are not limited to:

        a. Functioning as a surveillance agent, thus observing and recording movements of persons trafficking in drugs and those suspected of trafficking in drugs;

        b. Interviewing witnesses, confidential sources ("CS") and sources of information ("SOI") relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments); and

        c. Functioning as a case agent, entailing the supervision of specific investigations involving the trafficking of drugs and the laundering of monetary instruments.

4.      The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; information provided by a confidential source; analysis of public records; controlled purchases of drugs; analysis of social media information; analysis of telephone records; intercepted communications; and analysis of financial records.

5.      Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

II.    **PROBABLE CAUSE**

a.    *Background*

6.    In April 2023, a Drug Enforcement Administration (DEA) Confidential Source (CS) was added to a private WhatsApp group chat that included multiple Mexico-based numbers. This chat was observed to be utilized for the trafficking of methamphetamine, fentanyl, and human smuggling. Agents observed multiple members of this group chat engaging the discussion of both methamphetamine and fentanyl to include posting photos of fentanyl pills and engaging in the negotiation of prices related to these drugs. Over the course of 2023, Agents conducted multiple drug deals with individuals associated with this group chat. Operations targeting members of this group chat has led to the seizure of hundreds of thousands of fentanyl pills, and over a hundred pounds of methamphetamine, tens of thousands of dollars related to drug proceeds, multiple weapons, and the identification of multiple drug stash houses within the Phoenix area.

b.    *Identification of Carlos Martinez*

7.    On July 11, 2024, another member of this WhatsApp group chat posted a video of a stash house depicting approximately 200,000 to 400,000 fentanyl pills and multiple firearms. This member also posted prices for fentanyl pills and methamphetamine. Agents contacted this member and ordered 10,000 fentanyl pills for $3,000. The member of the group chat agreed to the deal and remained in communication with the Agents until July 15, 2024. On July 15, 2024, Agents contacted and arrested the member of the group chat in relation to the 10,000-fentanyl pill deal. In a post-*Miranda* interview, Arrestee identified his source of supply for the pills as "Rojo" with telephone number +52 667-350-7046 ("Rojo").

8.    While in the presence of Agents, Arrestee contacted Rojo and ordered 80,000 fentanyl pills. During subsequent communication with Rojo, price negotiations resulted in Rojo agreeing to a deal for 100,000 fentanyl pills. Rojo then told Arrestee to contact 602-

384-0369 (later identified as Courier). Arrestee then contacted Courier. Courier told Arrestee that they did not have that many fentanyl pills left.

9.      Arrestee then called Rojo through WhatsApp and told him that Courier did not have the requested amount left. While still on the phone call with the arrestee, Rojo dialed in three other phone numbers: 209-382-4473 (Gonzalo Carrillo), 602-469-1634 (Jesse Reynaga),[1] and 602-384-0369 (Courier). Arrestee identified the three individuals added to the call as drug couriers working on behalf of Rojo. The three phone numbers added to the call by Rojo were listed as participants on the WhatsApp Group Call. Rojo asked the drug couriers account for how many fentanyl pills each individual had left in their possession. Investigators heard Rojo talking to the couriers but could not identify at this time which individual was speaking.  Rojo then told Arrestee that he had "42," referring to 42,000 fentanyl pills. Arrestee agreed to the amount. Shortly thereafter, Courier corrected Rojo and said they had 40 (referring to 40,000 fentanyl pills). Rojo indicated Courier would deliver the pills to Arrestee.

10.     During subsequent communication with Courier, Courier provided Arrestee with a location for the deal, and a description of Courier's vehicle. Later that day, Courier contacted Arrestee and told him/her that he (Courier) had arrived to the agreed upon location for the deal. Agents contacted the vehicle and seized approximately 40,000 fentanyl pills and two pistols and one rifle. During a post-*Miranda* interview of Courier, Courier opened Courier's cellphone and identified Rojo as the individual that the drug courier takes orders for distributing fentanyl pills.

11.     The following day, July 16, 2024, Rojo called your Affiant and offered to provide information, if the DEA left him (Rojo) alone. Rojo provided the name Carlos Alberto Martinez ("Martinez") along with a photograph of a Arizona Department of

---

[1] In a previously authorized search warrant to track a vehicle, 24-6312MB, this phone number was incorrectly identified as belonging to Carlos Martinez.

Environment Quality Vehicle Inspection Report associated to a Mercedes. An Arizona Department of Motor Vehicles search of this VIN revealed a black Mercedes Benz with AZ license plate ITZMI77. The Mercedes is registered to Alexis Martinez, believed to be a relative of Martinez. The vehicle is registered at 10802 W 2nd Street, Cashion, AZ 85329, with a mailing address of PO Box 1323 Cashion, AZ 85329. Based on my training and experience, it is common for drug traffickers to register vehicles and other property in relative's names in order to avoid detection by law enforcement.

12.　　Rojo stated that the Mercedes is driven by Martinez. Additionally, Rojo said the vehicle could be found at the Sierra Verde Villas located at 105th Drive and W Monterosa Street. Rojo said that Martinez operates a stash house there. Rojo said that there is a gun safe inside this apartment with 50 "Cuernos" (commonly used to refer to AK-47s or similar looking rifles), as well as drugs. Rojo also provided multiple photographs of kilo quantities of white powder bricks consistent with both fentanyl and cocaine distribution in reference to this apartment. Rojo then provided multiple telephones for Martinez to include 520-759-5194 and 602-489-4816. Call records for these telephone numbers indicate that Martinez is frequently in contact with fellow DTO member Gonzalo Carrillo.

13.　　Agents conducted multiple site checks of the Sierra Verde Villas and observed the Mercedes parked at Apartment 47. During these multiple site checks, the Mercedes was the only vehicle consistently at the apartment during early morning hours and late-night hours. On August 14, 2024, agents received a federal search warrant to ping Carrillo's cellphone. Agents monitoring the pings observed Carrillo's cellphone consistently travel to the Sierra Verde Villas, where Martinez resides.

　　　c.　　*Martinez Prior Drug Trafficking with "Rojo"*

14.　　On September 30, 2024, agents conducted a buy/bust operation for 100,000 fentanyl pills in an unrelated investigation. During this operation, agents arrested four individuals to including Jesus Miguel Delgado Curiel, was the courier for the 100,000

5

fentanyl pills. Curiel provided consent to search his cellphone. Agents observed that Curiel was in communication with Rojo. Additionally, agents found a private WhatsApp group chat on Curiel's cellphone. During a search of this private WhatsApp group chat, agents observed Rojo post multiple photos and videos of large amounts of fentanyl pills, including one 10,000 pill bag with the name "RED" on it, indicating that this bag belonged to Rojo. Additionally, agents observed a member with a WhatsApp profile name "QTTV_Alex" with cellphone number 602-292-8515. This WhatsApp profile name matches the Facebook profile name of Martinez's Facebook account, "QTTV Los." Previous WhatsApp profiles for Martinez have also gone by the name Alex.

15.    On June 12, 2024, Martinez posted two photographs in the WhatsApp group chat depicting over 100 boxes/canisters of THC products for sale. Another individual named Ivan commented on the drugs saying, "say no to drugs." Martinez then responded, "We are still young, we have to get high." Then Ivan responded, "Of course, get the M30s, I have the aluminum foil ready." Martinez then posted a photo depicting approximately 200,000 to 4000,000 fentanyl pills in a pile of 10,000 pill bags. Ivan then responded "Some 20" indicating that he wanted 20,000 fentanyl pills. Based on my training and experience, Martinez posting a photograph of 200,000 to 400,000 fentanyl pills indicates that he is a trusted member of the organization. Additionally, larger/wholesale drug traffickers typically sell 10,000 pill bags versus smaller level dealers who sell 1,000 pill bags referred to as a boat.

16.    On August 7, 2024, in the same WhatsApp group chat, Martinez posted a photo of seven AK style rifles on the floor of an apartment consistent with 10501 W Calle de Luna, Apartment 47, Phoenix, AZ 85037.

d.    *Martinez Involvement in Firearm Trafficking*

17.    On August 4, 2024, HSI agents conducted a weapons trafficking investigation at a gun show in Tucson. HSI agents observed four males involved in the

suspected straw purchase of multiple AK style weapons. During this time, agents observed four males arrive in a truck. Agents observed two males including Martinez stay with the truck, while the other two males took turns going inside the gun show to purchase firearms.

18.    HSI agents conducted a traffic stop of the truck. Agents identified Martinez as an occupant of the truck. In the bed of the truck, agents located and seized approximately 20 firearms (17 AK-47 style rifles and three pistols), a stack of cash (approximately $12,000) rubber banded multiple times, which is indicative of illicit/drug proceeds, as well a small amount of cocaine. Investigators believed that the firearms were all purchased at the gun show. Martinez did not purchase any firearms himself, however, one of the male purchasers indicated in an interview with law enforcement that Martinez had directed him to purchase the firearms. Martinez was not arrested or charged at this time. Martinez has no prior felony convictions, but he has an outstanding warrant for failure to appear on DUI charges out of Gilbert.

19.    Investigators obtained and downloaded a cellphone from one of the straw purchasers, Higuera-Avalos. In this cellphone, investigators discovered Facebook messages between Higuera-Avalos near the time of Tucson gun show. On August 3, 2024, during the first day of the gun show, Higuera-Avalos sent a Facebook message to Martinez, "Zeke went back with 3 more, I needs get you 2 more." When Higuera-Avalos sent this message, he was at the gun show with Martinez and Ezekqio Chavez. Based on the investigators observations, they believed that Higuera-Avalos was telling Martinez that Ezekqio was walking to the vehicle with three firearms, and that Higuera-Avalos was going back into the gun show to purchase two additional firearms for Martinez.

20.    Additionally, on July 30, 2024, investigators observed that Higuera-Avalos send pictures of AK-47 rifles to Martinez. Martinez responded, "where else can you get more?" Martinez also told Higuera-Avalos, "you could get 2 more n my sis another one lol." Investigators believe that Higuera-Avalos was informed Martinez that he could

purchase AK-47 rifles for Martinez. Martinez was confirming for Higuera-Avalos that he could purchase three AK-47s for Martinez who would purchase them.

21.    On August 1, 2024, just a few days before the Tucson gun show, Higuera-Avalos communicated with an individual over Facebook Messenger about purchasing firearms. Higuera-Avalos was attempting to recruit individuals to purchase firearms asking if this individual knew anyone who was 21 years old without any criminal history. Additionally, Higuera-Avalos admitted that the guns they would purchase would go out of the country and would not be able to be traced.

     *e.*    *Surveillance of Martinez*

22.    On August 16, 2024, investigators observed Martinez come out of Apartment 47 and walk toward the Mercedes with keys in hand. While walking, Martinez spotted the surveillance vehicle and quickly went back into the apartment. Shortly thereafter, another Hispanic male of similar age exited the apartment, got into a vehicle parked near the apartment and began doing counter surveillance in the apartment complex, attempting to locate additional surveillance vehicles. Agents left the area following this event.

23.    On August 22, 2024, agents monitoring the pings for Carrillo's cellphone, observed the phone located near **Subject Premise 1**, an apartment complex on Northern Avenue in Phoenix. Agents contacted the apartment staff at this complex and confirmed that Carrillo is listed as the lease for **Subject Premise 1**. Later that day, agents observed the pings for Carrillo's phone travel to Martinez's apartment complex. Agents then setup on surveillance in the area of **Subject Premise 1**. At approximately 4:30 p.m., agents observed the Mercedes arrive to the apartment complex. Two unidentified females came out of **Subject Premise 1** and met with the Mercedes. Shortly thereafter, Carrillo exited the driver seat of the vehicle and went into the apartment. A few minutes later, Carrillo exited the apartment, got into the passenger side of the Mercedes and then the Mercedes left the area.

24.    On August 27, 2024, agents received a signed federal warrant case number 24-9376MB authorizing agents to install a tracking device on Martinez's Mercedes Benz. During multiple site checks, however, at that residence of 10501 W Calle de Luna, Apartment 47, Phoenix, AZ 85037, agents did not observe the Mercedes.  On September 6, 2024, agents observed a black 2021 Dodge Charger parked backed in the car port at 10501 W Calle de Luna, Apartment 47, Phoenix, AZ 85037. This spot has typically been reserved for Martinez's Mercedes. The registered address for the Dodge Charger is 10802 N 2nd Street, Avondale, AZ 85329. The mailing address associated to the vehicle is PO Box 1323, Cashion, AZ 85329. The address associated to the Dodge Charger is identical to the Mercedes Benz.  Additionally, the mailing address associated with the Dodge Charger matches the mailing address associated with the Mercedes. Investigators believe that Martinez began to use the Charger at this time.

25.    On September 9, 2024, Agents observed the Dodge Charger at **Subject Premise 1**, where Carrillo lives. Based on surveillance, agents believe that Carrillo works closely with and typically travels with Martinez. While conducting surveillance, agents observed Martinez **Subject Premise 1** with Carrillo. Agents then observed Martinez get into the driver's seat of the Dodge Charger and leave the area. Surveillance followed the vehicle which after a short period of time, returned to **Subject Premise 1**. On September 25, 2024, agents received a signed federal search warrant Case number 24-6312MB, allowing agents to install a tracking device on the Dodge Charger.

26.    On October 2, 2024, apartment management for 10501 W Calle de Luna, Apartment 47, Phoenix, AZ 85037 told agents that the occupants of Apartment 47 had moved out and failed to pay their rent. As a result, they would be evicted on October 10, 2024. Based on this information, it is believed that **Subject Premises 1** is Martinez's primary residence since approximately September 25, 2024. Investigators have also seen Martinez travel in the evening on several occasions to 3406 S. 95th Drive in Tolleson,

9

Arizona ("95th Drive Residence"). Investigators believe the residence on 95th Drive belongs to Martinez's girlfriend. Investigators believe that Carrillo's main residence is in Avondale based on telephone tracking data.

27.    On October 3, 2024, agents setup on surveillance in the vicinity of **Subject Premises 1** based on the tracker showing that Martinez's Dodge Charger was located in that area. At approximately 6:00 p.m., Agents observed Martinez exit **Subject Premises 1** in a red shirt, black shorts and a large satchel bag across the front of his body, get into the Dodge Charger, and leave the area.

28.    Agents followed Martinez to the 95th Drive Residence. Martinez took an indirect route to the residence, and completely avoided Interstate 10. Based on the tracker data, Martinez consistently drives to the 95th Drive Residence using indirect routes. Agents believe that this is due to Martinez employing advanced countersurveillance techniques while driving to this location. Martinez stayed at the 95th Avenue Residence for approximately 20 minutes before leaving the area. Agents then followed Martinez to the Arezzo Apartment Homes at 7205 W McDowell Road, Phoenix, AZ 85035. Agents observed Martinez pick up an unidentified male believed to be Arroyo ("Arroyo") who lives in that apartment complex. Agents then observed Martinez slowly drive around the entire perimeter of the complex before leaving the complex. Agents believe that Martinez was again employing countersurveillance to identify potential vehicles following him.

29.    Agents then observed Martinez drive into a neighborhood and park near 35th Avenue and Glendale Avenue. Shortly after parking, agents observed Martinez drive to a house one street north of where he initially parked, and parked his Dodge Charger. Agents could not observe what took place during this time. However, Martinez was at this location for approximately five to ten minutes. Agents then observed Martinez travel back to the Arezzo Apartment Homes at 7205 W McDowell Road, Phoenix, AZ 85035 and drop off Arroyo. Based on the pattern of movement, agents believe that Martinez picked up Arroyo,

went to the address off of 35th Avenue and Glendale Avenue to conduct a drug transaction, and then drop Arroyo back off at his residence. After dropping off Arroyo, agents observed Martinez drive back to the 95th Drive Residence. Agents then observed Martinez get food before returning to **Subject Premises 1**.

      *f.*    *Martinez Fleeing Law Enforcement*

    30.    On October 4, 2024, around 5:00 p.m., Martinez's Dodge Challenger left **Subject Premise 1** and agents via a vehicle tracker that Martinez traveled in far west Buckeye, Arizona, and area in which Martinez has not previously been seen. Based on the tracker information, agents observed Martinez make approximately four to five stops while driving in this area. With exception to the first stop, Martinez spent approximately five minutes at each of the subsequent stops. Martinez's travel did not appear to be consistent with someone traveling the closest location first before traveling to the next closest (pre-planned route). Agents believe this pattern of travel combined with short/quick stops was consistent with drug trafficking deals taking place during this time.

    31.    Later that evening while traveling back to Phoenix, Maricopa County Sheriff's Office attempted a traffic stop of the Dodge Charger for failing to maintain their lane of travel. The Dodge Charger pulled over upon seeing the lights and sirens. Upon the Sheriff's Deputy exiting his vehicle, Martinez drove off. According to tracker data, Martinez's Dodge Charger exceeded 140 mph during this time. The tracker data showed Martinez stop the vehicle near the 202 highway. Maricopa County Sheriff's deputies later caught up to the Dodge Charger, which was abandoned in a residential neighborhood, with the keys inside.

    32.    A canine trained to detect narcotics was deployed on the Dodge Charger. The canine alerted to the trunk of the vehicle. No drugs were found in the trunk. However, a white powder substance was observed in the trunk. The substance later tested positive for the presence of acetaminophen, a known/common cutting agent for fentanyl pills. During

a search of the vehicle, law enforcement found the same satchel bag that agents previously saw Martinez wearing, on the front driver side floorboard. Inside the bag law enforcement found a "Glock Switch/Auto Sear," a small metal device used to convert a semi-automatic pistol into a fully automatic pistol. The Glock switch that was located in Martinez's satchel bag is referred to as an "Invisible Switch," these are utilized to make the firearm still appear as if it is in its original state from the manufacturer. Weapons traffickers and controlled substances dealers typically are seen possessing these to not draw attention to themselves or the firearm if encountered by law enforcement. This device is a controlled item that requires additional legal paperwork to possess. Additionally, law enforcement found a handgun, two magazines, and four boxes of ammunition. Additionally, law enforcement found bank receipts for a Bank of America account. One receipt indicated that the account was overdrawn. The second indicated that the account holder deposited a $100 dollar bill on the same day. This activity combined with the 100-dollar bill is consistent with drug trafficking as drug traffickers typically operate in cash transactions.

33.     On October 7, 2024, agents obtained video footage from multiple building in the vicinity of where the Dodge Charger was parked. The footage obtained shows a Hispanic male consistent with Martinez exiting the driver seat of the Dodge Charger. This male is observed wearing the same red shirt and black shorts Martinez wore the night before when agents performed surveillance of Martinez. In this video footage, Martinez walks down the street where he was later picked up by an unidentified third party. Additional video footage of the vehicle shows that Martinez returned the following day with a vehicle that was previously seen at the 95th Drive Residence on Thursday October 3, 2024. During this video, Martinez is seen opening and looking into the Dodge Charger, but he did not drive the vehicle. Agents seized the Dodge Charger on October 7, 2024.

34.     On October 10, 2024, agents returned the Dodge Charger to the registered owner, who is believed to be a co-conspirator of Martinez. Agents believed that by

returning the Dodge Charger, Martinez would continue to use the vehicle which still had the tracker on it. Once the Dodge Charger was returned to the registered owner, agents observed the tracker move back to **Subject Premise 1**, but parked in a different location than Martinez's assigned parking spot. The registered owner claimed to live in the same complex as **Subject Premises 1**.

35.     On October 10, 2024, at approximately 8:45 p.m., agents observed the Dodge Charger stop at a residential area for approximately 4 minutes or less. Agents conducted a site check of the area the following day. Multiple neighbors told agents that the house that the Dodge Charger stopped at was a nuisance. These neighbors told agents that there is consistent vehicle traffic to this house. Once cars arrive, someone from inside will walk out and hand the occupants of the vehicle a bag. The neighbors told agents this happens every week, with the majority of these vehicles being sports cars. This type of behavior is consistent with drug trafficking transactions occurring from the house. Agents were also able to obtain video camera footage of the Dodge Charger arrive to this same house. Shortly after arriving, a male can be seen walking form the Dodge Charger to the front door of the house, before going out of view. It is believed that during this time, Martinez picked up drugs from this house. The tracker was then seen driving back to the 95th Drive Residence.

g.     *Social Media Investigation*

36.     As referenced above, investigators identified Arroyo as an associate of Martinez and Higuera-Avalos. Investigators learned that Arroyo was also a part time singer and that his stage name is "Kompa Pollo." Agents then looked up Kompa Pollo on Instagram. Agents observed that Arroyo posted a video of a narcocorrido (a song meant to glorify drug traffickers) titled, "Red Smurf." The title "Red Smurf" is a reference to Rojo (Red) and the Spanish word Pitufo or smurf. Pitufo is also a name given to drug traffickers who traffick fentanyl pills and work for the Sinaloa Cartel.

13

37.     On October 9, 2024, the Instagram profile Kompa Pollo posted a story (short video) that depicted Arroyo holding an AK style rifle, with another 6 AK style rifles stacked against the wall. The flooring, baseboards, and walls where this video was filmed identically resemble that of the flooring, baseboards and walls of **Subject Premises 1**. Agents did a site check of **Subject Premises 1** within an hour of the video being posted on Kompa Pollo's Instagram page. Agents observed the lights on at **Subject Premises 1**. Additionally, Agents observed a Chevrolet Impala parked in Martinez's assigned parking spot. The registered address associated to the Impala is Carrillo's residence. Additionally, a photo on Carrillo's Facebook two days prior, shows him in an Impala indicating that he was back in Phoenix. Based on this information, Agents believe that both Arroyo and Carrillo were both present at **Subject Premises 1** and that multiple AK style rifles were inside at that time.

38.     Based on the totality of the facts, your Affiant believes that the **Subject Premises 1** is utilized as a stash house for drugs and guns. Based on corroborated information provided by Rojo, agents believe that a search of **Subject Premises 1** will result in the seizure of multiple guns and drugs which Rojo told agents they would find at his primary residence. Although Martinez has moved primary residences from 10501 W Calle de Luna, Apartment 47, Phoenix, AZ 85037 to **Subject Premises 1**, certain facts remain consistent: Martinez utilizes a third-party name to rent his primary residence (currently that is Gonzalo Carrillo), Martinez frequents this apartment overnight more than any other, and multiple AK style firearms have been seen recently in an apartment consistent with **Subject Premises 1.**

### III.    ITEMS TO BE SEIZED

39.     Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found at the **Subject Premise 1**.

40.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

a.    Drug traffickers often keep large amounts of United States currency on hand in order to maintain and finance their ongoing trafficking activities.  Traffickers commonly maintain such currency where they have ready access to it, such as in their homes and vehicles. It is also common for traffickers to possess drug proceeds and items purchased with proceeds in their homes and vehicles. Thus, it is common for currency, expensive jewelry, precious metals, or financial instruments to be found in the possession of drug traffickers.

b.    Traffickers and persons involved in the manufacturing, distribution, and possession of controlled substances often possess firearms and other weapons, both legal and illegal, in order to protect their person, drugs, or the proceeds of drug transactions. Traffickers commonly maintain such firearms and weapons where they have ready access to them, such as on their person, in their homes, and in their vehicles. In addition, other firearm-related items, such as gun pieces, ammunition, gun cleaning items or kits, holsters, ammunition belts, original box packaging, targets, expended pieces of lead, photographs of firearms, and paperwork showing the purchase, storage, disposition, or dominion and control over firearms, ammunition, and related items are commonly possessed by drug traffickers along with their firearms.

c.    Traffickers often maintain paraphernalia for manufacturing and distributing controlled substances, including packaging materials, scales, and cutting agents.  Traffickers commonly maintain such paraphernalia at stash houses, in their homes, or in their vehicles.

d.    Traffickers often maintain paper records of their drug trafficking and money laundering activities.   Your Affiant knows that such records are commonly

maintained for long periods of time and therefore are likely to be found at the Subject Premises.

        e.     Drug traffickers commonly use computers, cellular telephones, and other electronic devices to communicate with other drug traffickers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, drug traffickers commonly use other capabilities of computers and electronic devices to further their drug trafficking and money laundering activities. Therefore, evidence related to drug trafficking activity and money laundering activity is likely to be found on electronic storage media found at the Subject Premises, as further described below.

      41.    In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the Subject Premises, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

///

///

///

///

///

///

///

///

///

///

## IV.  **CONCLUSION**

42.    Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance), 21 U.S.C. § 841 (Possession with Intent to Distribute a Controlled Substance), 18 U.S.C. § 933 (Trafficking in Firearms), 18 U.S.C. § 922(a)(6) 21 U.S.C. § 922(O)(1), 924(a)(2) (Possession or Transfer of a Glock Switch) are likely to be found at the Subject Premise, which is further described in Attachment A.

LUCAS HOSS  Digitally signed by LUCAS HOSS
Date: 2024.10.18 16:26:08
-07'00'

Special Agent Lucas Hoss
U.S. Drug Enforcement Administration

Subscribed electronically and sworn to me telephonically this ___18___ day of October, 2024.

HONORABLE MICHAEL T. MORRISSEY
UNITED STATES MAGISTRATE JUDGE